UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY D. DUNN,

    Plaintiff,

vs.

Case No. 05-71801
Hon. Lawrence P. Zatkoff

ELCO ENTERPRISES, INC.,
a Michigan corporation,

    Defendant.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on May 4, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment (Docket #12). Plaintiff has filed a response, and Defendant has filed a reply brief. The Court finds that the facts and legal arguments pertinent to Defendant's Motion for Summary Judgment are adequately presented in the parties' papers, and the decisional process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Defendant's Motion for Summary Judgment is DENIED.

## II. BACKGROUND

This case arises out of the termination of Plaintiff's employment by Defendant on October 28, 2004, which Plaintiff alleges resulted from Plaintiff engaging in activity protected under Section 510 of the Employee Retirement Income Security Act, 29 U.S.C. 1001 *et seq.* ("ERISA"). On July

8, 2004, Plaintiff informed Defendant's owner, Ed Cooper ("Cooper") that Plaintiff had discovered Defendant had not deposited his payroll-deducted contributions into the company-sponsored SIMPLE IRA Plan ("IRA Plan" or "Plan") for the past six months. Cooper claims he fired Plaintiff because Plaintiff had a bad attitude, was insubordinate and such behavior was no longer tolerable.

### A.     *Plaintiff's Employment*

Plaintiff began his employment with Defendant on September 23, 1997. At the time, Defendant was a start-up welding components distributor run by Cooper and his secretary. Plaintiff was hired to assemble and ship orders. Since that time, Defendant has grown to a 14-employee shop, and Defendant has had detailed human resources policies, including a "problem solving" policy (the "Policy"), in place since 2000. The Policy calls for progressive discipline, starting with verbal counseling, in order to eliminate problems in the workplace as soon as they are noticed. If the problem continues, the employee receives a "formal written disciplinary report." The Policy promises "[Defendant] will not discharge any non-introductory period team member without first conducting an investigation into the matter." It is undisputed that Plaintiff was never disciplined during his seven years of employment.

As discussed in detail below, there is substantial evidence that Defendant was a difficult person to work with or for, but there is also critical evidence that Plaintiff was a good employee and not a problem in the workplace.

### B.     *SIMPLE Plan*

Defendant sponsored a retirement savings program for eligible employees called a SIMPLE IRA Plan. Employee contributions were made through payroll deductions, and Defendant matched up to 3% of the employee's contribution. The Plan was administered by Salomon Smith Barney ("SSB"). Under the terms of the Plan, Defendant was required to deposit each participant's payroll deducted contributions every two weeks in their respective accounts with SSB. Cooper told employees they can never have too much savings and encouraged them all to participate in the Plan. In 2000, Plaintiff began participating in the Plan and having his pay deducted accordingly. When

Plaintiff pulled out his quarterly statement in July 2004, he realized monies had not been deposited since October, 2003. When Plaintiff's wife contacted SSB about this issue, she was told: "your company is not contributing your money." It was also discovered contributions for the calendar year of 2003 had not been deposited until December 2003.

On or about July 8, 2004, Plaintiff asked to meet with Cooper and Joyce Bohne, the company controller. Plaintiff informed them that he had discovered no contributions had been made to his IRA plan in 2004. According to Plaintiff, Cooper did not ask Plaintiff or Bohne any questions, nor did he deny Plaintiff's allegation. Rather, Cooper said: " I know it was wrong, we shouldn't have done that." When Plaintiff asked how this occurred, Bohne said: "We got behind – the company got behind on bills and had to pay the bills." Plaintiff questioned what bills were paid with his monies, and explained that he learned that this was not the first time Defendant had stopped depositing employee contributions. Bohne reiterated they knew it was wrong and promised to make it right. At the end of the meeting, Plaintiff submitted his request to withdraw from the Plan.

On July 11, 2004, a letter was prepared from Cooper to Plaintiff apologizing for "the company's tardiness" in depositing his IRA contributions. The letter stated: "It was truly not our intent to hide this from you or to appear dishonest. I understand your anger and frustration in this matter, completely. All I can do is apologize and make it financially right for you." The closing words of the letter were: "I realize this matter has left a bad impression on you. I am hoping you can get past this, knowing you are a valued employee."

On July 13, 2004, Defendant made a lump sum deposit to Plaintiff's account for six months of his payroll contributions, unpaid matching, and estimated lost earnings. On July 13, 2004, Cooper notified employees that he discontinued the SIMPLE IRA Plan.

*C.     Plaintiff's Termination*

On October 29, 2004, Cooper called Plaintiff into a conference room, handed him a termination letter, and said "as of this time you're immediately terminated." When Plaintiff asked for a reason, Cooper replied: "I'm an at-will employer. I do not have to have a reason." Later that

day, Defendant's employee, Bobby Smilowski, stopped by Plaintiff's house and told him Cooper had a meeting where "everyone asked why" Plaintiff was terminated and Cooper gave no reason.

### III.  LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted).  In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### IV.  ANALYSIS

**A.     Applicable Law**

Section 510 of ERISA provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary *for exercising any right to which he is entitled under the provisions of an employee benefit plan ...* or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . . It shall be unlawful for any person to discharge, fine, expel, or discriminate against any person *because he has given information or has testified or is about to testify in any inquiry or proceeding* related to this chapter.... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

29 U.S.C. §1140 (emphasis added). The Sixth Circuit recognizes two types of claims under ERISA §510: (1) an "exercise" or "retaliation" claim where "adverse action [is] taken because a participant availed himself of an ERISA right; and (2) an "interference" claim where adverse action is taken as "interference with the attainment of a right under ERISA." *Mattei v. Mattei*, 126 F.3d 794, 797 n.4 (6th Cir. 1997).

Contrary to the primary focus of Defendant's argument, this case involves the first type of claim, *i.e.*, one arising from retaliation for exercise of ERISA rights.  In this case, the alleged retaliation for exercise of protected rights was Plaintiff's termination after making a complaint to Cooper about the failure to fund the Plan.  As Defendant correctly notes and as Plaintiff acknowledges, there was no attempt to communicate the Plan issues to any third party, nor was there any litigation threatened or initiated, prior to Plaintiff's termination.  As such, the Court cannot agree with Defendant that the case is about whether Defendant interfered with any of Plaintiff's rights.

In order to establish a prima facie claim of retaliation under Section 510, a plaintiff must show (1) he was engaged in activity protected under ERISA; (2) he suffered an adverse employment action; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *See Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986); *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992). After the plaintiff establishes a prima facie case,

the employer has the burden of introducing evidence of a legitimate, nondiscriminatory reason for the challenged action. To prevail, the plaintiff must establish that the proffered reason is a pretext for retaliation. The fact finder's disbelief of the employer's proffered reasons, particularly if disbelief is accompanied by evidence of mendacity, may, together with the elements of a prima facie case, suffice to permit an inference of retaliation for summary judgment purposes. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).

**B.      Plaintiff Has Established a Prima Facie Case**

In this case, there is no dispute that Plaintiff suffered an adverse employment action. Defendant, however, maintains that, as a matter of law, Plaintiff was not engaged in protected activity under ERISA and, even if Plaintiff was engaged in protected activity, there is no causal link between the protected activity and Plaintiff's termination.

*1.      Plaintiff Was Engaged in Protected Activity under Section 510*

The parties agree that the Sixth Circuit has not addressed the issue of whether Section 510 protects informal (internal) complaints or objections related to plan provisions, changes or actions that the employee believes are illegal.  Only four circuits have squarely addressed whether internal complaints are covered by Section 510. The Second, Ninth, and Fifth Circuit courts have held that internal complaints are protected under Section 510. *See e.g., Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325 (2nd Cir. 2005); *Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311, 1313 (5th Cir. 1994); and *Hashimoto v. Bank of Hawaii*, 999 F.2d 408, 411 (9th Cir. 1993).

The Fourth Circuit is the only circuit court to conclude that internal complaints are not protected by Section 510. *See King v. Marriott International, Inc*., 337 F.3d 421 (4th Cir. 2003). The Fourth Circuit based its conclusion on the Fourth Circuit's previous finding that similar language in the Fair Labor Standards Act, 29 U.S.C. §201 *et seq*, ("FLSA"), excluded internal complaints.  The *King* court held that Section 510's use of the phrase "inquiry or proceeding" applies only to "legal or administrative, or at least . . . something more formal than written or oral complaints made to a supervisor." *Id.* at 427.  Defendant urges this Court to adopt the conclusions

of the Fourth Circuit and hold that Section 510 does not protect Plaintiff from retaliation because his complaints were made only internally, rather than to an outside agency or as a precursor to litigation.

This Court is not persuaded by Defendant's arguments, however, as the Court finds that the Sixth Circuit is likely to adopt the reasoning of the Second, Fifth and Ninth Circuits. First, the Sixth Circuit has addressed ERISA and Section 510 in the past, and those cases offer some guidance on the interpretation the Sixth Circuit has given to Section 510. For example, in *Schwartz v. Gregori*, 45 F.3d 1017, 1021 (6th Cir. 1995), the Sixth Circuit held that "[t]he plain language of the statute creates a cause of action based on an employer's retaliation for an employee's exercise of a right to which she is entitled, not just under a benefit plan, but under ERISA itself." *Id.* (citing *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992), and *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989)). In addition, the Sixth Circuit has held that ERISA provided a remedy to a plaintiff for retaliation based on her exercise of her fiduciary duties with respect to plan participants. *See Authier v. Ginsberg*, 757 F.2d 796, 798-800 (6th Cir.), *cert. denied*, 474 U.S. 888 (1985) (state law claim of retaliation preempted by ERISA where the plaintiff, a co-administrator of a profit sharing plan, sent letters to participants expressing concerns that proposed changes to the plan could violate ERISA).

Second, unlike the Fourth Circuit's interpretation of the FLSA as not protecting internal complaints, the Sixth Circuit has interpreted the same FLSA language as covering internal complaints to management. *See Moore v. Freeman*, 355 F.3d 558 (6th Cir. 2003) (citing *EEOC v. Romeo Comm. Schools.*, 976 F.2d 985, 989-90 (6th Cir. 1992)). *See also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (finding internal complaints of discrimination constitute protected activity under Title VII of the Civil Rights Act). Accordingly, this Court does not believe that the Sixth Circuit would adopt the reasoning of the *King* court.

> This statute is clearly meant to protect whistle blowers. It may be fairly construed to protect a person in Hashimoto's position if, in fact, she was fired because she was protesting a violation of law in connection with an ERISA plan. The normal first step in giving

> information or testifying in any way that might tempt an employer to discharge one would present the problem first to the responsible managers of the ERISA plan. If one is then discharged for raising the problem, the process of giving information or testifying is interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is blown.

*Hashimoto*, 999 F.2d at 411.

For the foregoing reasons, the Court finds that the activity protected under Section 510 includes internal complaints made by an employee. In this case, Plaintiff complained to Cooper that payroll contributions were not being deposited in his IRA plan account in accordance with Plan provisions. Accordingly, the Court concludes that Plaintiff was engaged in Section 510 protected activity in July 2004.

    *2.       There Is a Causal Link*

"Although no one factor is dispositive in establishing a causal connection, evidence ... that the adverse action was taken shortly after a plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). However, "[p]roximity alone may not survive summary judgment . . . nor does it necessarily imply causation." *Chandler v. Specialty Tires of America*, 283 F.3d 818, 826 (6th Cir. 2002); *See also Nguyen, supra* (mere temporal proximity between filing of a discrimination charge and the failure to promote not enough to support an inference of retaliation).

Plaintiff asserts that the timing of his discharge, together with several other events, establish a causal link sufficient to overcome a summary judgment motion. In addition to his termination, Plaintiff cites the following as indicative of a causal link between his complaint to Cooper and his termination:

1. During a staff meeting on July 19, 2004, Cooper made the following note about Plaintiff in his planner:

    > *Passive Aggressive Behavior/Silent Insubordination*
    > *Today Jeff sat on the left end of table not opposite as usual, every*
    > *time I said something he would give a look of discuss [sic] with gestures*

    After the next staff meeting on July 26, 2004, Cooper made a similar note:

> *Passive/Aggressive Behavior*
> *Jeff behaved this week like last.*

Cooper never made any notes about alleged "insubordination" and "passive/aggressive behavior" before this time, which was only a few weeks after Plaintiff confronted him about the IRA. Cooper never talked to Plaintiff about any of this alleged behavior, and there is no evidence Cooper viewed Plaintiff as insubordinate prior to his protected activity.

2. The hiring of Ryan McGuire in July 2004, shortly after Plaintiff lodged his complaint with Cooper. Plaintiff was responsible for training McGuire and Plaintiff believes McGuire replaced him.

3. At some point in August, Cooper and Plaintiff were discussing Ryan McGuire's performance. When Plaintiff told Cooper that McGuire's performance was getting worse, Cooper said they owed it to Ryan's father [an employee of Defendant] to let Ryan work at least 90 days. Cooper allegedly then changed the subject and, in an agitated demeanor, said "you still have a chip on your shoulder. I had nothing to do with that IRA plan. That was all Joyce's doings."

4. Cooper's attitude toward Plaintiff allegedly changed, including Cooper's refusal to meet with Plaintiff on a regular basis or communicate with Plaintiff unless necessary.

Defendant argues the timing between Plaintiff's protected activity and his discharge lacks the closeness in time typically required in ERISA cases, and that the other events described by Plaintiff lack merit. For instance, with respect to the notes following the staff meetings, Cooper claims he wrote the first note because: "all of a sudden he changed his seating location, which didn't matter, but he would sit to my left at the other end and not look at me when he talked [sic] me. He would basically make gestures when I'd make statements." Cooper claims he made the second note because Plaintiff "wasn't sitting across from me anymore" and was not actively participating in the meeting.

Defendant also asserts that McGuire was hired shortly after Plaintiff's request in mid-June 2004 to hire someone to help him and that McGuire was not a replacement for Plaintiff. In fact, Defendant notes that McGuire was fired for poor performance five weeks after Plaintiff. Defendant disputes Plaintiff's claims that Cooper ignored him and refused to communicate with him, and Defendant offers extensive deposition testimony that supports that position. Defendant acknowledges that Cooper made the "chip on your shoulder" remark in August 2004, but argues that

9

even Plaintiff concedes that no other discussions regarding the IRA Plan occurred thereafter.

The parties offer conflicting legal support for their positions with respect to proximity. For example, Defendant argues that the timing of Plaintiff's termination does not give rise to an inference of retaliatory discharge. *Humphreys v. Bellaire Corp.*, 966 F.2d 1037 (6th Cir. 1992) (discharge of employee two months before vesting of pension benefit could not give rise to inference of pretext); *Mathews v. Trilogy Comm., Inc.,* 143 F.3d 1160 (8th Cir. 1998) (no causal connection between termination two months after submitting a claim under plan where employee had previously submitted claims without any adverse action). On the other hand, Plaintiff notes that action taken just over three months after protected activity is sufficient temporal proximity from which to infer a retaliatory motive. *Singfied v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004).

For purposes of this summary judgment motion, the Court finds that there is sufficient evidence upon which to conclude that there is a causal link between Plaintiff's complaint to Cooper and his termination. In essence, this issue turns on the credibility of all the parties and witnesses to this action. There is conflicting testimony from the parties and the "impartial" witnesses on many of the critical matters. Therefore, taking the evidence in a light most favorable to the Plaintiff, as the Court must on a motion for summary judgment, *see Matsushita, supra*, the events described by Plaintiff began shortly after the protected activity and Plaintiff was then discharged less than 4 months later. Again, in a light most favorable to Plaintiff, the fact that it took four months before Plaintiff was terminated could be explained by a fact finder giving credence to the contention that Plaintiff was retained during that period in order to provide McGuire with sufficient training.

*4.     Conclusion*

For the reasons set forth in this Section IV.B., the Court finds that Plaintiff has set forth a prima facie case.

**C.     Defendant Had Legitimate, Non-Discriminatory Reason to Terminate Plaintiff**

Defendant asserts that it had a legitimate, non-discriminatory reason for terminating Plaintiff,

*i.e.,* that Plaintiff had demonstrated a pattern of abuse, insubordination, lack of teamwork and a general inability to cooperate with other employees of Defendant both before and after July 8, 2004, and that such behavior was no longer acceptable at the Defendant's workplace.

The deposition testimony of numerous employees supports the Defendant's position. For example, Defendant's supervisor, Kevin Copeland, testified that he had received complaints from employees about their relationships with Plaintiff and how they weren't getting along with him. Copeland also testified that Plaintiff would often lose his temper and punch shipping boxes. Copeland testified that in one instance Plaintiff agitated an employee to the point that the employee walked out of the plant and quit working for Defendant because of Plaintiff. Jeannie Wertzbar testified that Plaintiff would deliberately hold onto orders until the last minute to make her look bad, that Plaintiff deliberately altered her time card, and that Plaintiff deliberately embarrassed her with unprofessional behavior in front of a customer one week before his termination. Steve Hayes, a fellow employee, testified that he saw Plaintiff slit open boxes and walk by without removing any items from them. Another fellow employee, Bobby Smilowski, described Plaintiff as verbally abusive and consistently rude to other employees in the plant. Smilowksi also said that the only way to get along with Plaintiff was to keep to yourself.

Plaintiff does not dispute that Defendant has introduced evidence of a legitimate, non-discriminatory reason for Plaintiff's termination.

For the reasons set forth below in this Section IV.C., the Court finds that Defendant has set forth a legitimate, non-discriminatory reason for terminating Plaintiff.

**D.    Defendant's Proffered Reason may be Pretextual**

A plaintiff may establish pretext by showing the employer's proffered explanation is unworthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.133, 143 (2000). In this case, there is sufficient evidence upon which a jury could find that Defendant's proffered reason for Plaintiff's termination was pretextual. A few of the key reasons for the Court's conclusion are set forth below.

First, the parties agree that Plaintiff was very skilled and technically competent. During his seven year employment, there were many instances of positive performance. For example, in 2000 and 2001, Plaintiff's former supervisor, Don Lyons, stated that Plaintiff: (a) "exceeds" and "meets" expectations in all areas, and (b) was a "team worker" and encouraged him to be "more assertive" with coworkers, and (c) was as a "key contributor" and thanked Plaintiff "for hanging in there with us." Cooper also recognized Plaintiff's value to the Defendant at times. He once rewarded Plaintiff with a pay raise "in appreciation and recognition of your loyalty to Defendant, *your coworkers*, and our customers." (emphasis added). In 2002, Cooper wrote a very complimentary letter for Plaintiff's file, stating in part:

> Jeff, you and I go back quite a few years now and I consider you a key contributor to ELCo. Your support has always meant a lot to me personally. My door is always open to you if you have concerns or questions about what it is going on around you or around us as a company. Thanks again, Jeff, for all you do and your dedication. I value your friendship.

Plaintiff received regular merit-based pay increases in 2003 and 2004. In January 2004, at the company's bowling party (held in lieu of a Christmas party that year), Cooper gushed to Cindy Plaintiff about Plaintiff's work, and how he (Cooper) wished he had more employees like Plaintiff.

Second, Cooper testified that was upset with Plaintiff for blowing the whistle on his ERISA violations: "I had a little problem with the attitude because he came in like I was stealing from him or something, which I don't do that to my employees" ... "his attitude was that we had taken advantage of him. That was my interpretation of his attitude, that we had taken advantage of him. That's the way it came across to me."

Third, despite Cooper's contention that the episode involving Plaintiff embarrassing Wertzbar in front of the customer was the straw that broke the camel's back, Cooper never mentioned a word about this alleged event in his deposition and did not identify it as a triggering event. Fourth, despite the provisions of the Policy which promise to coach and counsel employees, apprise them of serious problems in writing, give them a chance to improve, and only consider

12

termination after all those efforts fail, Defendant terminated Plaintiff before any corrective action was taken.

Fifth, the testimony of many of the employees of Defendant regarding Defendant's behavior is inconsistent (both as between the employees and even as by a single employee). Most notably, when asked about Plaintiff prior to the date this lawsuit was filed, Cooper, Copeland and Hayes gave Plaintiff positive job references to third parties. For example, in January, 2005, months before this lawsuit was filed, Cooper completed a reference for a prospective employer of Plaintiff. Cooper had the choice of rating Plaintiff on a 5-point scale from "very poor" to "very good." Cooper rated Plaintiff "very good" on ***cooperation*** and "good" on ***attitude***. Copeland told a separate prospective employer that he thought Plaintiff "was a good employee" with "no violent tendencies" and that the company was *not* better off with him gone. Finally, Hayes said that Plaintiff was a "fine employee" who exhibited "no violent tendencies." Hayes also said that he would like to work with Plaintiff again.

Sixth, Cooper repeatedly testified that he was unaware of Defendant's failure to make plan contributions in 2004 until Plaintiff notified him of the same on July 8, 2004, and Cooper laid all the blame on the controller, Joyce Bohne. Bohne testified, however, that Cooper was well aware that IRA contributions were not being made in 2004 before Plaintiff confronted them on July 8, 2004. Bohne also testified that she and Cooper talked about that issue on a weekly basis.

As the foregoing testimony and events demonstrate, Plaintiff has set forth sufficient evidence that Defendant's proffered reason for Plaintiff's termination are pretextual. As recognized by the Sixth Circuit, an employer's true motivations are particularly difficult to ascertain in a retaliation case and therefore "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence." *Singfied v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004). This is especially true where the disputed factual issues may only be resolved by assessing the credibility of the witnesses, as is the situation in this case.

Accordingly, the Court hereby DENIES Defendant's Motion for Summary Judgment.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

           s/Lawrence P. Zatkoff
           LAWRENCE P. ZATKOFF
           UNITED STATES DISTRICT JUDGE

Dated:  May 4, 2006

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on May 4, 2006.

           s/Marie E. Verlinde
           Case Manager
           (810) 984-3290